J-S31001-16 & J-S31002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: L.B.M., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.P., MOTHER | |
| | No. 1834 MDA 2015 |

Appeal from the Order Entered September 25, 2015
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 42-Adopt-2014

| | |
|---|---|
| IN RE: ADOPTION OF: A.D.M., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.P., MOTHER | |
| | No. 1835 MDA 2015 |

Appeal from the Order Entered September 25, 2015
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 41-Adopt-2014

| | |
|---|---|
| IN THE INTEREST OF: L.B.M., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.P. | |
| | No. 1836 MDA 2015 |

Appeal from the Order Entered September 25, 2015
In the Court of Common Pleas of Franklin County
Juvenile Division at No(s): CP-28-DP-0000050-2013

| IN THE INTEREST OF: A.D.M., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| APPEAL OF: J.P. | |
| | No. 1837 MDA 2015 |

Appeal from the Order Entered September 25, 2015
In the Court of Common Pleas of Franklin County
Juvenile Division at No(s): CP-28-DP-0000051-2013

BEFORE: SHOGAN, OTT, and STRASSBURGER,* JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MAY 31, 2016**

J.P. ("Mother") appeals from the orders involuntarily terminating her parental rights to her sons, L.B.M. (born in May of 2011) and A.D.M. (born in March of 2007) (collectively "the Boys"), changing their permanency goals to adoption, and denying Mother's motion to modify placement.[1] We affirm.

Mother voluntarily referred the Boys to Franklin County Children and Youth Service ("the Agency") on or about July 3, 2013, because she was without proper housing and resources to care for them.[2] Following a shelter

_____

* Retired Senior Judge assigned to the Superior Court.

[1] This Court *sua sponte* consolidated the above-captioned appeals. Order, 11/20/15.

[2] The Boys' natural father, J.D.M. ("Father"), was incarcerated at the time of their placement. Father's rights were involuntarily terminated by order of court on November 25, 2014. This Court affirmed that decision. ***In re***
*(Footnote Continued Next Page)*

care hearing on July 5, 2013, the Boys remained in the Agency's care. Following a hearing on July 11, 2013, the Boys were adjudicated dependent pursuant to 42 Pa.C.S. § 6302(1) and placed in foster care. The trial court appointed Attorney Kristen Hamilton as the Boys' guardian *ad litem* ("the GAL"). Order of Court, 7/8/13.

During the Boys' placement, the trial court conducted six permanency review hearings: October 8, 2013; January 2, 2014; April 14, 2014; October 3, 2014; January 26, 2015; and May 19, 2015. At each hearing, Mother was ordered to obtain suitable housing and financial stability, to maintain consistent visitation with the Boys, to comply with the terms of her criminal sentence and probation, and to participate in a psychological evaluation and follow any recommendations. As of April of 2014, Mother was not compliant with her permanency plan. Permanency Review Order, 4/21/14, at 1. Moreover, since the Boys' placement, Mother had been incarcerated four times: 7/5/13 to 10/2/13; 10/24/13 to 11/6/13; 12/12/13 to 4/24/14; and 5/5/14 to 6/20/14. Permanency Review Order, 11/25/14, at 1; N.T., 10/3/14, at 12.

The Agency filed a petition for termination of Mother's parental rights on August 6, 2014. Following a hearing on October 3 and 24, 2014, the trial court declined to terminate Mother's parental rights due to the Agency's

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

**L.B.M.**, 94 MDA 2015, 122 A.3d 1132 (filed June 15, 2015) (unpublished memorandum).

failure to establish by clear and convincing evidence grounds under section 2511(a)(2), (5), or (8), and due to Mother's demonstrated progress, her stable housing and employment, and the emotional bond between Mother and the Boys, especially A.D.M. Decree, 11/25/14, at 13–21.

Mother filed a motion for modification of placement on July 2, 2015, requesting that the Boys be placed with their maternal grandparents: grandmother B.O. and step-grandfather R.O. Motion for Modification of Placement, 7/2/15, at ¶¶ 4–10. The GAL and the Agency filed answers on July 15, 2015, and July 20, 2015, respectively, opposing modification of the Boys' placement in foster care.

The GAL filed a petition for termination of mother's parental rights on August 4, 2015 ("the Petition"), and a motion to incorporate the previous proceedings on August 28, 2015. Mother filed a motion to appoint counsel for the Boys on August 8, 2015, to which the Agency and the GAL filed separate answers on August 31, 2015. The trial court granted the GAL's motion to incorporate the prior proceedings and denied Mother's request for counsel. Orders of Court, 9/19/15.

The trial court held a hearing on the GAL's petition for termination and simultaneously received evidence on Mother's motion for modification of placement on September 15 and 18, 2015. In separate orders, the trial court denied Mother's motion for modification, terminated Mother's parental rights to the Boys pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8), and changed their permanency goals to adoption. Orders of Court, 9/22/15, and

9/25/15. Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on October 20, 2015. Thereafter, the trial court filed its Pa.R.A.P. 1925(a) opinion on December 7, 2015.

Mother presents the following statement of issues for our review:

1. The trial court erred in determining that the Guardian *Ad Litem* established the statutory grounds by clear and convincing evidence for terminating [Mother's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5) and (a)(8) when Mother voluntarily sought the initial placement of the [Boys] due to homelessness, remedied the conditions which led to the voluntary placement of the [Boys] by having stable housing for over a year, and exhibited a strong bond with the [Boys].

2. The trial court erred in not appointing legal counsel for the [Boys] in a contested involuntary termination of parental rights hearing as required by a clear mandate of 23 Pa.C.S. § 2313(a) and particularly in light of the Guardian *Ad Litem* and [A.D.M.'s] position on termination being oppositional; thus making the Guardian *Ad Litem* unable to effectively and adequately effectuate the duty of loyalty to [A.D.M.] required as legal counsel.

3. The trial court erred in changing the goal from reunification to adoption where a bond exists between Mother and the [Boys] and where Mother made substantial progress toward the circumstances which necessitated the original placement when Mother had safe, stable housing and employment for over a year, maintained consistent visitation with the [Boys], and was compliant with her drug and alcohol treatment.

4. The trial court erred in denying Mother's motion for the [Boys] to be placed with their maternal grandparents when the [Boys] had a relationship with their grandparents their entire lives and the grandparents were approved as a kinship placement by Family Care Services following a home study.

Mother's Brief at 4 (reformatted).

We review these appeals with the following standards in mind:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted).

The termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to section 2511(a)(2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of section 2511(a) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Additionally, pursuant to section 2511(b), the trial court must determine whether termination of parental rights would best serve the developmental, physical and emotional needs of the child. *In re C.M.S.*, 884 A.2d 1284, 1286–1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287 (citation omitted). We have instructed that the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.*

We analyze the trial court's decision to terminate under section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

Disposition of a dependent child is governed by section 6351(e), (f), (f.1), (f.2), and (g) of the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, which provides the trial court with the criteria for its permanency plan for the subject child. "Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child." *M.T.*, 101 A.3d at 1173.

Section 6351(e) of the Juvenile Act provides in pertinent part:

**(e) Permanency hearings.**—

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child....

42 Pa.C.S. § 6351(e). Subsections 6351(f), (f.1), (f.2), and (g) prescribe the pertinent inquiry for the reviewing court:

**(f) Matters to be determined at permanency hearing.**—

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join an petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that

places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(e), (f), (f.1), (f.2), and (g).

In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary. *In re A.K.*, 936 A.2d 528, 532–533 (Pa.Super.2007). The burden is on the [petitioner] to prove the change in goal would be in the child's best interests. *In the Interest of M.B.*, 449 Pa.Super. 507, 674 A.2d 702, 704 (1996).

*In re M.T.*, 101 A.3d 1163, 1173 (Pa. Super. 2014). Moreover, this Court

has stated:

The focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency, and well-being of the child. The best interests of the child take precedence over all other considerations, including the conduct and the rights of the parent.... While parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors. *In re A.K.*, 936 A.2d 528, 534 (Pa.Super.2007).

*M.T.*, 101 A.3d at 1175; *see also In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (granting goal change to adoption despite the fact that the mother had made substantial progress toward completing her permanency plan because mother's parenting skills and judgment regarding her children's emotional well-being remained problematic).

- 11 -

Regarding the placement of a child, a panel of this Court stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. *See In re Sweeney*, 393 Pa.Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent ... the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to 'provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter.' 42 Pa.C.S. § 6301(b)(1.1). Indeed, '[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child.' *In re E.F.V.*, 315 Pa.Super. 246, 461 A.2d 1263, 1267 (1983).

*In re K.C.*, 903 A.2d 12, 14–15 (Pa. Super. 2006). The primary purpose of the disposition of a dependent child is to examine what is in the best interest of the child. 42 Pa.C.S. § 6351(a); *see In re Tameka M.*, 580 A.2d 750, 753 (Pa. 1990) ("In ordering a disposition under Section 6351 of the Juvenile Act, the court acts not in the role of adjudicator reviewing the action of an administrative agency, . . . rather the court acts pursuant to a separate discretionary role with the purpose of meeting the child's best interests.") (quoting *In re Lowry*, 484 A.2d 383 (Pa. 1984)).

We have reviewed the briefs of the parties, the certified record, the relevant law, and the opinion filed by the Honorable Carol L. Van Horn on December 7, 2015. In doing so, we conclude that the trial court thoroughly considered the facts as provided at the termination hearing. Additionally, the trial court thoroughly analyzed the statutory factors for termination of

parental rights pursuant to Pa.C.S. § 2511(a) and (b) and for a goal change pursuant to 42 Pa.C.S. § 6351, as well as the procedures for modification of placement pursuant to Pa.R.J.C.P. 1606 and the appointment of counsel pursuant to 23 Pa.C.S. § 2313(a). Trial Court Opinion, 12/7/15, at 5–24, 29–44. Moreover, the trial court's findings are supported by the record, and we discern no abuse of its discretion in terminating Mother's parental rights, changing the Boys' permanency goals to adoption, denying Mother's motion for modification of placement and her request for appointment of counsel. Therefore, we affirm the trial court's orders on the basis of its December 7, 2015 opinion.[3]

Orders affirmed.

Judge Ott joins the Memorandum.

Judge Strassburger files a Dissenting Memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2016

---

[3] The parties are directed to attach a redacted copy of that opinion in the event of further proceedings in this matter.

- 13 -

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| IN RE: ADOPTION OF<br>A.D.M.<br><br>A Minor | : <br> : <br> : <br> : | Orphans' Court Division<br><br>41 - ADOPT - 2014 |
| | : | |
| IN RE: ADOPTION OF<br>L.B.M.<br><br>A Minor | : <br> : <br> : <br> : <br> : | Honorable Carol L. Van Horn<br><br>42 - ADOPT - 2014<br><br>Honorable Carol L. Van Horn |

IN INTEREST OF:            :        Juvenile Court Division
                                            :
        A.D.M.,                        :        CP-28-DP-0051-2013
        A Minor Male Child        :
                                            :
Born: March ● 2007            :
                                            :        Honorable Carol L. Van Horn
IN INTERSEST OF:            :
                                            :
        L.B.M.,                        :        CP-28-DP-0050-2013
        A Minor Male Child        :
                                            :
Born: May ● 2011            :
                                            :        Honorable Carol L. Van Horn

---

OPINION *sur* Pa.R.A.P. 1925(a) AND ORDER OF COURT

DEC 07 2015

ATTEST: A TRUE COPY

Clerk of Courts

Before Van Horn, P.J.

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
## OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.D.M. | : | Orphans' Court Division |
| | : | |
| A Minor | : | 41 - ADOPT - 2014 |
| | : | |
| IN RE: ADOPTION OF L.B.M. | : | Honorable Carol L. Van Horn |
| | : | |
| A Minor | : | 42 - ADOPT - 2014 |
| | : | |
| | : | Honorable Carol L. Van Horn |

---

| | | |
|---|---|---|
| IN INTEREST OF: | : | Juvenile Court Division |
| | : | |
| A.D.M., A Minor Male Child | : | CP-28-DP-0051-2013 |
| | : | |
| Born: March 2007 | : | |
| | : | Honorable Carol L. Van Horn |
| IN INTERSEST OF: | : | |
| | : | |
| L.B.M., A Minor Male Child | : | CP-28-DP-0050-2013 |
| | : | |
| Born: May 2011 | : | |
| | : | Honorable Carol L. Van Horn |

## STATEMENT OF CASE

A.D.M. was born on March 2007, in Chambersburg, Pennsylvania. L.B.M. was born on May 2011, also in Chambersburg, Pennsylvania. J.L.P. ("Mother") is the natural mother of A.D.M. and L.B.M. The boys' natural father is J.D.M. ("Father"). The boys came into the care of Franklin County Children and Youth Service ("the Agency") pursuant to an Order of Court on July 3, 2013. The placement was a result of a referral by Mother that she was without proper housing and resources to continue to care for the boys. At the outset of the dependency

1

proceedings Kristen Hamilton, Esquire, was appointed as the boys' Guardian *Ad Litem*. ("GAL"). As of the date of the current Petition was filed, the boys have been in placement for over 24 months.

On August 6, 2014, the Agency filed a Petition for Termination of Parental Rights of Mother and Father. On October 3, 2014, and October 24, 2014, hearing was held on the matter. By a November 25, 2014, *Opinion and Order of Court*, this Court granted the termination of Father's parental rights but declined to terminate Mother's parental rights. In deciding not to terminate Mother's parental rights, the Court placed significant emphasis on the emotional bond Mother shared with A.D.M. Father then filed a timely Notice of Appeal. The Superior Court affirmed this Court's decision on June 15, 2015.

On August 4, 2015, the GAL filed a Petition for the Involuntary Termination of Parental Rights of Mother. ("Petition"). On August 28, 2015, Mother filed Motions to Appoint Counsel for both boys. The Agency and GAL both filed separate Answers on August 31, 2015. This Court denied the Motion on September 9, 2015.[1] On August 28, 2015, the GAL filed a Motion for Incorporation of Record of Prior Proceedings which this Court granted on September 9, 2015. On July 2, 2015, Mother filed a Motion for Modification of Placement seeking to have the boys placed with their grandparents,[2] B███ O████ and R███ O████. ("the O████s"). On July 15, 2015, the GAL filed an Answer in response to the Motion. The Agency also filed an Answer on July 20, 2015.

---

[1] Specifically, this Court's Order stated "**IT IS HEREBY ORDERED THAT** the Motion is **DENIED**. 23 Pa. C.S. § 2313(a) gives this Court the discretion to appoint counsel or a GAL to represent any child who has not reached 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. Given the age of the child and the GAL's established relationship with him, the Court is satisfied that his best interests are well represented. " *See* Order 9/9/15.

[2] B███ O████ is Mother's natural mother and R███ O████ is Mother's stepfather.

2

Hearing was held on the Petition and Motion for Modification of Placement on September 15, 2015, and September 18, 2015. A Permanency Review Hearing was also held at this time. On September 25, 2015, by *Opinion and Order of Court*, this Court terminated the parental rights of Mother to both boys. The boys' goal as to Mother was also changed from reunification to adoption and the Court denied Mother's Motion for Modification of Placement. On October 20, 2015, Mother filed a timely Notice of Appeal of a Children's Fast Track Appeal pursuant to Pa.R.A.P. 102 and her Concise Statement of Matters Complained of on Appeal. The Court now responds to Mother's claims of error in this Opinion and Order of Court pursuant to Pa.R.A.P. 1925(a).

## ISSUES

### I. Termination of Parental Rights

In Mother's Concise Statement regarding the termination of her parental rights she raises the following issues:

1. This Court decision to terminate Mother's parental rights constitutes an abuse of discretion because:

    a. There is insufficient evidence to determine by clear and convincing evidence that there is a repeated and continued incapacity, abuse, neglect or refusal of Mother that has caused the children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and causes cannot or will not be remedied.

    b. There is insufficient evidence to determine by clear and convincing evidence that the conditions which led to the removal or placement of the children continues to exist, Mother cannot or will not remedy those conditions within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

    c. There is insufficient evidence to determine by clear and convincing evidence that the conditions which led to removal or placement of the children continues to exist and termination of parental rights would best serve the needs and welfare of the child.

    d. There was insufficient evidence to determine by clear and convincing evidence that permanently severing the bond between Mother and the children will not have a

3

detrimental effect on the child and is in the best interest of the children despite evidence to the contrary.

  e. The trial court erred by not giving primary consideration to the developmental, physical and emotional needs and welfare of the children in terminating Mother's rights.

2. The trial court erred by not appointing counsel to represent the children's legal position during the proceedings despite the clear mandate of 23 Pa. C.S. § 2313(a) that "[t]he court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents." The discretion given to the court to appoint counsel or a guardian ad litem is specifically limited to "other proceedings" under the Adoption Act, and by the clear language of the statute is not applicable to involuntary termination proceedings. 23 Pa. C.S. § 2313(a).

3. The trial court erred in admitting hearsay evidence contained within Petitioner's Exhibits 1, 3, and 5. The caseworker's reports are not evidence, only matters within the report that are established by properly accepted evidence at the hearing. Therefore, the report itself is not admissible as evidence.

4. The trial court erred in admitting permanency review orders from the juvenile docket where the orders were entered under a lower evidentiary standard than that applicable to a termination of parental rights hearing.

## II. Goal Change and Motion for Modification of Placement

In Mother's Concise Statement regarding the boys' goal change and denial of her Motion to Modify Placement she raises the following issues:

1. The trial court's decision to change the placement goal from reunification to adoption is not supported by clear and convincing evidence and constitutes an abuse of discretion for the following reasons:

  a. Mother has substantially complied with the permanency plan in that she has safe and suitable housing for the children, is employed and financially capable of providing for the children's basic necessities such as food, clothing and shelter, is enrolled in drug and alcohol classes determined to be the appropriate level of treatment by her drug and alcohol counselor, consistently participates in visitation with the children, and participated in both a psychological and psychiatric evaluation and complies with the recommendations of those evaluations.

  b. Mother has made substantial progress in alleviating the circumstances which necessitated the original placement in that Mother has safe and appropriate housing for the children, is employed and financially capable of providing for the children's basic

4

necessities such as food, clothing and shelter, and is safely able to parent and care for the children.

c. No evidence was presented as to a current safety risk to the children; rather the evidence present and the trial court's analysis was that of stability based on speculative future circumstances and not the relevant current inquiry and analysis of safety. "Judicial determination related to removal, reunification and permanency should be governed by safety." *Pennsylvania Dependency Benchbook* Second Edition Harrisburg, PA: Office of Children and Families in the Courts, 2014, page 2-6.

2. The trial court erred in denying Mother's *Motion to Modify Placement* of the children from foster care to approved kinship care whom has had a relationship with the children since birth, consistently visited with the children while in placement, and has a safe and stable home for the children to reside.

## DISCUSSION

### A. Involuntary Termination

In termination cases, the burden rests on the petitioner to prove by clear and convincing evidence the grounds asserted are valid. *See In re A.S.*, 11 A.3d 473, 477 (Pa. Super. Ct. 2010). Clear and convincing evidence is testimony "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citations and quotations omitted). The trier of fact is the sole judge of credibility, free to resolve any conflicts in the evidence and to believe all, part, or none of the evidence presented. *See id.* In any context, the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take. *In Re Adoption of Sarver*, 281 A.2d 890, 891 (Pa. 1971). "[T]ermination of parental rights has often been called the "death penalty" of dependency court, because of the seriousness and finality of a termination order severing all ties between a child and their biological parents." Pennsylvania Children's

5

Roundtable Initiative. *Pennsylvania Dependency Benchbook* Second Edition Harrisburg, PA:

Office of Children and Families in the Courts, 2014.

The policy of this Commonwealth is aligned with that set forth in the Adoption and Safe

Families Act. To wit, when reasonable efforts to return a child to their biological parent have

failed and the parent has not benefitted from reunification efforts, the right of the child to

fulfillment of their potential in a "permanent, healthy, safe environment" must take precedence.

*See In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. Ct. 2004). Indeed:

> [W]hen a child is placed in foster care, after reasonable efforts
> have been made to reestablish the biological relationship, the needs
> and welfare of the child require CYS and foster care institutions to
> work toward termination of parental rights, placing the child with
> adoptive parents. It is contemplated this process realistically
> should be completed within 18 months.

*In re G.P.-R.*, 851 A.2d 967, 975-76 (Pa. Super. Ct.2004). The policy was designed to "curb an

inappropriate focus on protecting the rights of parents when there is a risk of subjecting children

to long term foster care," or forcing them to return to situations involving abuse or neglect. *In re

C.B.*, 861 A.2d 287, 295 (Pa. Super. Ct. 2004).

This Court is aware of the significant pain a parent suffers when faced with the

termination of his parental rights. Yet, just as parents have parental rights over their children,

they also have duties to provide for and care for their children. Through the statute permitting

the termination of parental rights (23 Pa. C.S. § 2511 *et seq.*), our legislature has required

"certain irreducible minimum requirements of care that parents must provide for their children,

and a parent who cannot or will not meet the requirements within a reasonable time following

intervention by the state may properly be considered unfit and have his parental rights

terminated." *In re Z.P.*, 994 A.2d at 1118 (*quoting In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super.

2001)).

6

The grounds for termination are controlled by statute. *See* 23 Pa. C.S.A. § 2511(a). Under 2511(a)(8), the Agency must prove: "(1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. Ct. 2003). Under this section, a twelve (12) month time frame exists for a parent to remedy the conditions leading to the child's removal. *See In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. Ct. 2010). Once the requisite time frame is established, the court must determine whether conditions that led to the child's removal continue to exist, despite the Agency's reasonable, good faith efforts. *See id.* This section does not require the court evaluate "a parent's current willingness or ability to remedy the conditions that initially caused placement, or the availability or efficacy of Agency services." *Id.*

Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child." *M.E.P.*, 825 A.2d at 1273-74.

Under Section 2511 (a)(2), the petitioner must demonstrate the repeated and continued incapacity and neglect of the parent, that such neglect has caused the child to be without essential parental care, and that the causes of the incapacity will not be remedied. *See In re A.S.*, 11 A.3d 473, 479 (Pa. Super. Ct. 2010) (citation omitted). Where "sincere efforts to perform parental

7

duties can preserve parental rights under (a)(1), those same efforts may be insufficient to remedy parental incapacity under (a)(2)." *Z.P.*, 994 A.2d at 1117.

If the Court finds one of the above grounds have been satisfied, it must proceed to an evaluation of the Child's best interest under Section 2511(b). In determining the needs and welfare of the child, a primary concern is the "nature and status of the emotional bond between parent and child." *In re I.G.*, 939 A.2d 950, 956 (Pa. Super. Ct. 2007). In this analysis, the Court may consider "the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *A.S.*, 11 A.3d at 483. The court should also consider the continuity of relationships, and whether the termination of parental rights will sever an existing parent-child bond. *See id.*

I.      **Termination of Mother's Parental Rights Under Subsection of 2511(a).**

In subsection a-c of Mother's Concise Statement, she challenges this Court's termination of her parental rights. Mother essentially argues that the Petitioner failed to establish termination was proper under Section 2511(a). Specifically, Mother argues that there was not clear and convincing evidence presented at the hearing that Mother's repeated incapacity has caused the children to be without essential care or subsistence necessary for their physical or mental well-being and the conditions and causes cannot or will not be remedied. Additionally, Mother avers that there was not clear and convincing evidence that the conditions which led to the placement of the children continue to exist, that Mother cannot or will not remedy the conditions within a reasonable time and that termination best serves the needs and welfare of the children. Although Mother does not specify in her Concise Statement, these arguments are challenges to the termination of Mother's parental rights under 2511(a)(2), (a)(5) and (a)(8). As noted, on September 25, 2015, by *Opinion and Order of Court*, this Court terminated the parental rights of Mother to both boys finding that the Petitioner had established that termination was proper under

8

2511(a)(2), (a)(5) and (a)(8). For the reasons that follow, this Court finds Mother's arguments to be without merit.

It is undisputed that the Agency previously filed a Petition for Termination of Parental Rights of Father and Mother on August 6, 2014. Despite terminating Father's parental rights, this Court declined to terminate Mother's parental rights and the boys' permanency goal remained reunification with Mother as of November 25, 2014. In reaching this decision, the Court noted that the Agency had failed to fully satisfy that termination was appropriate under Section 2511(a)(2),(a)(5), or (a)(8). Specifically, this Court found that the causes of the boys' placement no longer existed and had been remedied by Mother. Furthermore, this Court noted the significant emotional bond that existed between Mother and the boys, particularly with A.D.M. At the prior TPR hearing, testimony unequivocally established that A.D.M. loves his mother deeply and wishes to reside with her. It was equally clear that Mother loves both of her boys a great deal. This bond in the Court's view was one that, especially with A.D.M., was still a necessary and beneficial relationship despite numerous shortsighted mistakes by Mother. Such mistakes included numerous criminal convictions resulting in jail time and relapses in Mother's battle with drug and alcohol addiction.

Evidence presented at the hearing on the current Petition illustrate that the previously analysis employed by this Court under 23 Pa.C.S. 2511(a) regarding Mother's parental rights is no longer appropriate. To date, nearly ten (10) months have passed since this Court's initial decision not to terminate Mother's parental rights and to continue reunification efforts with the boys. In fact, at the time of the hearing, the boys had been in placement for over two years, easily satisfying the time requirements in sections (a)(8) and (a)(5). Despite this, Mother currently finds herself in a more grave and precarious situation than she was in nearly a year ago. The incapacity

9

which necessitated the boys' placement was Mother's imminent homelessness and lack of resources to care for the boys. Reunification efforts with the boys have been delayed by Mother's repeated incarcerations. It is now clear that Mother's incapacity continues and will not be remedied by Mother which satisfies many of the requirements in sections (a)(2), (a)(5), and (a)(8).

Although Mother is no longer homeless, she is essentially no closer today than she was 26 months ago to being reunified with the boys. If anything, Mother's continued shortsighted behavior during the last two years reveals that the incapacity which led to the boys' placement continues and will not be remedied. Simply put, Mother has time and again put her own selfish desires ahead of reunification with the boys despite this Court willingness to look past prior misconduct for the first sixteen (16) months of the boys' placement last November.

On May 14, 2015, Mother attended the boys' most recent permanency review hearing. The same court-ordered services to achieve reunification that Mother has been instructed to complete throughout the boys' placement were again reiterated to her. N.T. 9/15/15 at 32. Specifically, Mother was to maintain financial stability, stable housing, consistent visitation with the boys, comply with the terms of her criminal sentence and/or probation, and refrain from further criminal activity and successfully complete drug and alcohol treatment as well as participate in family therapy with the boys. *Id.*

Although Mother was making significant strides up until April of 2015 and was just days away from being reunified with the boys, testimony at the hearing established that she was doing so while knowingly violating her probation. N.T. 9/18/15 at 7-8. Specifically, she was not residing at her home plan approved by Franklin County Probation and compliance with her probation was a specific requirement of her compliance with Children and Youth provisions. *Id.*

10

Mother's step-father, Mr. O██████, testified at the hearing that Mother was basically using his home (her approved home plan) as a "storage unit" and residing at another residence for roughly two months before her violation was discovered. N.T. 9/15/15 at 218-219, 227. To make matters worse, the man Mother was residing with at this unapproved residence was out on parole for a felony robbery conviction and this contact was also a violation of Mother's probation. N.T. 9/18/15 at 7. Finally, Mother admitted at the hearing to using alcohol, another violation of her probation, multiple times during April of 2015. *Id.* at 8, 12, 33-34.

Despite a plethora of evidence presented at the hearing that Mother was violating her probation throughout March and April of 2015, none of these violations had yet been discovered. However, from December of 2014 until April of 2015, Mother was making significant progress in complying with other of her court-ordered services. Mother was maintaining consistent visitation with the boys, including obtaining unsupervised visits with them. N.T. 9/15/15 at 29. She had obtained stable housing at the O██████' residence. *Id.* Mother had also made strides in achieving financial stability as she had been employed at Beck Manufacturing starting in September of 2014. N.T. 9/18/15 at 26-27. In December of 2014, Mother attended a family group decision-making conference and family therapy. N.T. 9/15/15 at 80. She was also discharged from drug and alcohol treatment. N.T. 9/18/15 at 28. At this point, Mother felt she was ready for the boys to return home and the Agency agreed that it was time for reunification. N.T. 9/15/15 at 41. Prior to the first weekend in April, the Agency decided it would file a Motion and Order on Monday April 6, 2015, for the boys to be returned to Mother by the end of the week. *Id.*

Over Easter weekend[3] and just days before April 6, 2015, the boys had an unsupervised visit with Mother. *Id.* at 42. When the boys returned to their foster home, L.B.M. had marks on

---

[3] Easter Weekend of 2015 was April 3 through 5.

11

his face and chest. *Id.* He also had a bruise on his collarbone. *See* Pet.'s Exhibit 16. As a result of the incident, the Agency received a child protective services referral. At this point, the Agency came to the conclusion that returning the boys to Mother may not be best at that time. It was then decided that reunification should be postponed until after A.D.M.'s school year was complete. N.T. 9/15/15 at 41-42.

Ultimately an investigation into the incident by Pennsylvania State Police and the Agency was unfounded because a mechanism for the injury and the person responsible could not be identified. N.T. 9/15/15 at 49. The only explanation that Mother was able to provide for how L.B.M. obtained the marks and bruise was that it could have occurred while she was tickling him or while L.B.M. was playing outside with other children. N.T. 9/18/15 at 6. Medical documentation received by the Agency indicated that the injuries sustained by L.B.M. were not consistent with normal childhood activity and more consistent with non-accidental trauma. N.T. 9/15/15 at 89-90. Although the Agency received this information, the incident was still determined to be unfounded.

However, Mother's failure to comply with the terms of her criminal sentence and probation was eventually discovered and proved to negate so much of the progress towards reunification she had been making. On April 21, 2015, Mother was re-incarcerated for violating her probation for failing to comply with the terms of her home plan. *Id.* at 31. Despite her incarceration, Mother participated in contact visits with the boy while in jail on May 18, 2015, and August 8, 2015. *Id.* at 88-89. On June 8, 2015, Mother tested positive for suboxone which she testified at the hearing she took in the jail after she received it from another inmate. N.T. 9/18/15 at 4. As a result, Mother was placed on disciplinary status and her visitation privileges with the boys at the jail were revoked. 9/15/15 at 36. By her own admission Mother knew before

12

taking the suboxone that she would likely get caught. N.T. 9/18/15 at 24. Despite being cognizant of this, Mother again made a choice that she knew would negatively impact her ability to see the boys and would further delay reunification.

As a result of Mother again be incarcerated and her violation while in jail, the GAL made the difficult and uncommon decision to file the instant Petition. The Agency supported the decision. At the hearing, Ms. Weller explained the Agency's reasoning:

> Q: . . . But is the agency objecting to the goal being changed to adoption at this point?
>
> A No.
>
> Q Why is that?
>
> A The children have been in care for 26 months. And [Mother] has been incarcerated for over half of that time period. And where we are today, the agency feels we're worse off today than what we were in October and November of last year.

N.T. 9/15/15 at 57. On the day the GAL filed the Petition, August 6, 2014, Mother remained incarcerated. As such, the reasons the boys originally came into placement, that Mother could not provide stable housing and resources for them, was no different than it had been over two years ago. Turning to the second element of 2511(a)(2), it was equally clear that Mother's continued incapacity, specifically her repeated incarcerations and inability to complete her court-ordered services, had caused the boys to be without essential parental care, control and subsistence.

Having established that the conditions which led to the boys' placement continued to exist at the time the Petition was filed, the Court must determine if these conditions and Mother's incapacity will not be remedied. Clearly, Mother's repeated periods of incarceration have stripped her of the ability to consistently maintain financial stability and suitable housing. At the

13

time the most recent petition was filed, Mother was not only incarcerated but also on disciplinary status. Mother's disciplinary status prevented her from working towards one of the few court-ordered services she could continue while incarcerated, consistent visitation with the children. However, even at the time of the hearing, after she was released from jail, Mother had only recently obtained employment through her natural father's business and had been living at his father's residence for less than a month. N.T. 9/15/15 at 91, 93. N.T. 9/18/15 at 22. In fact, Mother testified she has not lived independently since before the children came into placement. N.T. 9/18/15 at 22-23. Mother has been incarcerated on five separate occasions in the last two years and has spent 56% of the boys' placement behind bars. *Id.* at 43. All of these facts led to the logical conclusion that the conditions that led to the placement of the boys continue and Mother has not and will not remedy them.

Section 2511(a)(5) also requires that "services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time." Evidence at the hearing clearly illustrated that the Agency has offered and provided an array of services to Mother over the last two years. N.T. 9/15/15 at 29, 69, 74, 79, 86. Despite these exhaustive attempts by the Agency, Mother has failed to remedy the conditions of placement for over 26 months at the time of the hearing. There appear to be no other services that the Agency could offer at this point that would result in remedying Mother's issues and reunifying her with the boys. N.T. 9/18/15 at 52.

The final requirement under both (a)(5) and (a)(8) is that the termination of parental rights best serves the needs and welfare of the child. Our High Court has made it clear that a trial court must consider the effect of severing a parental bond if one actually does exist. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). This Court recognizes that there is absolutely no question

14

that there is an emotional bond between Mother and the boys, particularly Mother's bond with A.D.M. N.T. 9/18/15 at 52. A.D.M.'s caseworker, Ryan Kane, testified that A.D.M. expresses significant disappointment with his Mother's repeated incarcerations but that he still loves her. N.T. 9/15/15 at 149, 160. This Court has no doubt that Mother loves both her boys. However, while an emotional bond is a major component in the analysis of § 2511(b) best-interest analysis, it is only one factor among many that a court should employ in making a determination under 2511(a). The court should also consider other factors such as safety, love, security, comfort, the stability and bond the child has with a foster parent, and whether the parental bond can be severed without detrimental effects on the child.

A best-interest determination under 2511(a) requires a separate analysis for each child in this case. As noted, A.D.M. and Mother share a significant emotional bond. In contrast, L.B.M.'s bond appears to be considerably less. Testimony at the hearing illustrated that L.B.M. does enjoy seeing Mother and can be affectionate towards her during visits. N.T. 9/15/15 at 115-116. However, it is clear that L.B.M. recognizes his foster parents as his parents and not Mother. *Id.* at 55. This is undoubtedly due to L.B.M.'s age when the placement began. He refers to his foster parents as "mommy" and "daddy."[4] *Id.* The emotional bond that Mother does share with L.B.M. is easily distinguishable from that she shares with A.D.M. although some emotional bond does exist.

Furthermore, all of the other factors strongly support a determination by this Court that terminating Mother's parental rights is in the best interest of L.B.M. Mother's repeated incarcerations and inability to maintain financial stability and suitable housing strongly indicate that Mother has and will continue to struggle to consistently make L.B.M. feel safe, secure and comfortable. On the other hand, neither the Agency nor Mother herself have any concerns about

---

[4] Nicole Weller testified at the hearing that L.B.M. refers to Mother as "brother's mommy." N.T. 9/15/15 at 55-56.

15

the care L.B.M. receives while in the care of the foster parents. N.T. 9/18/15 at 16, 41. As the Superior Court highlighted when it affirmed termination of Father's parental rights, foster father is a licensed social worker with a master's degree. L.B.M. looks to his foster parents for security, support and comfort. Further, L.B.M. appears to be flourishing while in the care of his foster parents. In addition to recognizing his foster parents as his natural parents, L.B.M. also shares a significant bond with them. N.T. 9/15/15 at 157. L.B.M. has a loving and beneficial relationship with his foster siblings. *Id.* at 54-56. L.B.M.'s foster parents provide him with nurturing, security and love he needs on a daily basis. N.T. 9/18/15 at 49.

Finally, this Court finds that L.B.M.'s bond with Mother could be severed without it having detrimental effect on him. At the time of L.B.M.'s placement he was just 26 months old. Since the boys' placement on July 3, 2013, Mother has been incarcerated from July 5, 2013 through October 2, 2013; from October 24, 2013 through November 6, 2013; from December 12, 2013 through April 24, 2014; from May 5, 2014 through June 20, 2014 and from April 21, 2015 through August 20, 2015. These five separate incarcerations account for more than 50% of the total time L.B.M. has been in placement. N.T. 9/18/15 at 43. Mother's repeated incarcerations and unavailability has prevented L.B.M. the opportunity of developing a lasting bond with her. This helps explain why L.B.M. recognizes his foster parents as mom and dad and why he refers to Mother as "brother's mommy." N.T. 9/15/15 at 55-56. Given L.B.M.'s young age, it was essential Mother be available to him in order to form a beneficial and lasting bond. However, Mother's inability to stay out of jail has thwarted her ability to create such a bond.

For all these reasons, the Court finds that severing the parental bond with Mother best serves the needs and welfare of L.B.M.

16

Although A.D.M. has a much stronger and definable emotional bond with Mother, this Court still believes severing his parental bond with Mother best serves his needs and welfare. Analogous to the analysis used for L.B.M. on this issue, Mother's repeated incarcerations and inability to maintain financial stability and suitable housing strongly indicate that Mother has and will continue to struggle to consistently make A.D.M. feel safe, secure and comfortable. Evidence at the hearing illustrated that it is now his foster parents that A.D.M. turns to for security, support and comfort. N.T. 9/15/15 at 123, 152, 160-161.

A.D.M. also shares a significant emotional bond with his foster parents. *Id.* at 156. Despite recognizing that Mother is his natural mother, A.D.M. has recently started calling his foster parents mom and dad. *Id.* at 56. A.D.M. tells his foster parents he loves them and expresses affection towards them which is reciprocated. *Id.* at 156, 160-161. Both A.D.M. and L.B.M. have also bonded with their foster siblings. *Id.* at 51-52. Like his brother, A.D.M. is also thriving in the foster home and performing better in school as a result of increased stability. *Id.* at 48, 51-52. Mr. Kane testified that if A.D.M. could choose his living arrangement he would like to stay with his foster parents and have Mother move in with them. *Id.* at 154.

This Court recognizes that its decision to terminate Mother's parental rights will affect A.D.M. far more than his brother. A.D.M. will undoubtedly grieve for the loss of the chance to someday be reunified with Mother. However, severing Mother's parental bond, and allowing his foster parents to move forward with adoption best serves his needs and welfare. Mr. Kane testified at trial that the most important thing A.D.M. needs at this juncture is permanency. *Id.* at 158. A.D.M. needs to know where he is going to live and who is going to be a consistent and supportive part of his life. Simply put, he needs to be able to be a child. *Id.* His placement lasting over two years has robbed him of this in many ways. Although A.D.M. is doing well in his foster

17

home, the continued uncertainty regarding reunification with his Mother is taking its toll. Mr. Kane testified that A.D.M. expresses extreme disappointment and sadness with Mother when he learns she has again been incarcerated.[5] N.T. 9/15/15 at 149-151. Because A.D.M.'s primary need is permanency, this Court finds that although it will be painful for him, severing Mother parental bond will best serve his needs and welfare. Accordingly, this Court finds that the Petitioner has satisfied the requirement of 2511(a)(2), (5), and (8) and Mother's argument to the contrary is unconvincing.

## II. Termination of Mother's Parental Rights under Subsection of 2511(b).

In subsections d and e of Mother's first issue in her Concise Statement, she argues that there was insufficient evidence to determine by clear and convincing evidence that Petitioner satisfied the requirements for termination under 2511(b). Mother asserts that the trial court did not give primary consideration to the developmental, physical and emotional needs of the children. Further, Mother asserts that permanently severing the bond will have a detrimental

---

[5] Specifically, Mr. Kane testified:

> Q The last time when [Mother] was incarcerated, can you tell me how [A.D.M.] was told?
> A I brought him to your office so we could tell him together.
> Q And how do you believe [A.D.M.] took the news?
> A Tough to see a kid sink like that.
> Q Had it been a really long time since you had seen that type of reaction from [A.D.M.]?
> A Yeah, because he was really hoping to go home. And then it just kind of turned on a dime really quickly.
> Q Did [A.D.M.] have any concems about specifically why she went back to jail?
> A He did.
> Q What was his primary concern?
> A He asked whether or not it was drugs or alcohol.
> Q When you told him it wasn't, did he have a visible reaction?
> A Maybe more questions. Visible reaction, I think he expected it to be that. . .

(emphasis added). N.T. 9/15/15 at 150-151.

18

effect on the children and is not in their best interest. This Court cannot agree as the record is replete with evidence to the contrary.

After a petitioner has satisfied a subsection under 2511(a), the Court must find it is in the child's best interest to terminate parental rights, both in terms of their needs and welfare under 2511(b). In determining the needs and welfare of the child, a primary concern is the "nature and status of the emotional bond between parent and child." *In re I.G.*, 939 A.2d at 956. Although this inquiry shares certain similarities with the previous needs and welfare analysis employed in 2511(a), it differs in that our "focus is not on the parent's conduct, but on the child and his or her needs." *Id.* "A proper section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa. Super. 2008).

It is obvious to all involved in this case that an emotional bond exists between Mother and the boys, particularly A.D.M. However, the mere existence of an emotional bond does not prevent a court from terminating parental rights if it is necessary. *Id.* Termination is proper even when an emotional bond exists if the parent is "either unwilling or unable to satisfy the irreducible minimum requirements of parenthood." *Id.* In the instant matter, the Court finds that Mother has been unable to satisfy these irreducible requirements of parenthood for the entirety of the boys' placement as a result of her repeated incarcerations and inability to maintain proper housing and financial stability. Mother clearly loves the boys; however, love does not extinguish her responsibility to provide the boys with these irreducible requirements. Mother may have the best of intentions and this Court in no way doubts the feelings she has for both of her boys. However, adequate parenting requires "action as well as intent," guidance and discipline as well as affection. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. Ct. 2002). These boys deserve both.

19

Further, the emotional bond between the boys and Mother, particularly with A.D.M., is no longer a nurturing, beneficial and healthy parent-child relationship. A.D.M.'s relationship with Mother is one clouded with disappointment and uncertainty rather than comfort and security. Although A.D.M. loves Mother, his debilitating relationship with her is impeding his ability to continue to grow and thrive. On this point, this Court stated the following at the conclusion of the hearing:

> As to Subsection (b) of 2511, the bond, I recognize that there is a bond particularly between [A.D.M.] and you, [Mother]. **But it is not a nurturing bond. It is not a bond that provides safety and protection as a parent must provide for a child.**
>
> And it is that bond that is causing [A.D.M.] so much difficulty when he sees that you're not able to provide everything else in the form of a consistent home, finances, drug-free life, crime-free life, association with individuals who are not involved in the system.
>
> And frankly, there's a difficulty in [A.D.M.] recognizing, [Mother], that you're not truthful. And not telling the truth has gotten you into a situation involving incarceration.
>
> So [A.D.M]. and [L.B.M]. will have work to do. As the GAL said, they'll go through the grieving process. It will be a different grieving process. But I believe they've already been through grieving processes several times. As they have prepared to be reunited with you only to have their hopes dashed because of your actions.

(emphasis added) N.T. 9/18/15 at 52-53.

A.D.M.'s permanency worker, Mr. Kane, emphasized in his testimony that A.D.M.'s primary need at this point is permanency. N.T. 9/15/15 at 158. Like all children, both of these boys deserve permanency. However, the length of the boys' placement has resulted in A.D.M. now badly **needing** permanency. (emphasis added). Further, for reasons stated above, this Court

20

does not believe that terminating the bond between Mother and the boys will have a detrimental effect on them. Consequently, this Court finds that in the best interest of the boys' needs and welfare Mother's parental rights be terminated.

## III. Failure to Appoint Children Separate Legal Counsel

Next, Mother avers that this Court erred when it did not appoint counsel to represent the children's legal positions during the termination proceedings despite the language of 23 Pa. C.S. § 2313(a). Regarding representation of a child during a termination proceeding, 23 Pa. C.S. 2313(a) states:

> (a) Child.--The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

Based on this statutory authority, on August 28, 2015, Mother filed Motions to Appoint Counsel for both boys. After Answers were filed by the Agency and the GAL, this Court denied the Motions stating:

> IT IS HEREBY ORDERED THAT the Motion is DENIED. 23 Pa. C.S. § 2313(a) gives this Court the discretion to appoint counsel or a GAL to represent any child who has not reached 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. Given the age of the child and the GAL's established relationship with him, the Court is satisfied that his best interests are well represented.

*See* Order 9/9/15.

Mother contends that the language of § 2313(a) represents a clear mandate that this Court has discretion to decide between appointing the child legal counsel or a guardian ad litem only in

21

"other proceedings." Mother concludes that such discretion is not applicable to involuntary termination proceedings. This Court does not agree.

It is well established that "[t]he purpose of 2313(a) is to ensure that the needs and welfare of a child will be actively advanced by an advocate who owes loyalty only to the child." *In re Adoption of G.K.T.*, 75 A.3d 521, 527 (Pa. Super. 2013) quoting *In re Adoption of Hess*, 562 A.2d 1375, 1380 (Pa. Super. 989). At the core of Mother's argument is that this Court should have appointed legal counsel despite the fact that both children already had a GAL who was also an attorney. Specifically, Kristen Hamilton, Esquire, had previously been appointed as GAL for both children during their dependency proceedings, the prior termination proceeding in which Father's parental rights were terminated and was continuing to serve in such capacity at the time of hearing on the Petition was filed.

Reviewing the case law applicable to Section 2313(a), it is clear to this Court that Mother's argument is without merit. Specifically, in *In re K.M.*, 53 A.3d 781, (Pa. Super. 2012), the Superior Court dealt with the precise issue Mother now asserts. In *K.M.*, the appellant asserted that the orphans' court erred because "appointment of counsel is mandatory pursuant to § 2313(a) and that 'a Guardian ad Litem cannot play a dual role acting both as legal representation for the child and as guardian ad litem.'" *Id.* at 786. *Specifically*, the K.M. Court found that:

> Although § 2313(a) mandates that the orphans' court appoints
> counsel in all cases where involuntary termination of parental
> rights is contested, the plain language of § 2313(a) is not clear and
> free from ambiguity when applied to a scenario where, as here, the
> orphans' court appointed an attorney to serve as the child's
> guardian ad litem. The complexity is highlighted by the provision's
> first two sentences. While the first sentence of § 2313(a) directs
> that counsel shall be appointed in all cases where involuntary
> termination is contested, the second sentence addresses a situation
> where a trial court has discretion to appoint counsel or a guardian

22

ad litem. While the case at bar does not fall within the latter scenario, the legislature's use of a disjunctive conjunction in the provision illustrates its recognition that in most cases it would be superfluous to appoint both counsel and an attorney serving as guardian ad litem. The official comment explaining the prospective application of § 2313 further illuminates the legislature's perspective.

> This new provision requires the court to appoint counsel for a child when parental rights are being involuntarily terminated and, when necessary, to appoint a guardian ad litem for a child who has not reached the age of 18 years. The guardian ad litem concept is broad enough to allow the appointment of a person other than a lawyer. For example, a social worker could be appointed guardian ad litem within this provision; in an appropriate case a nonlawyer guardian ad litem could request appointment of counsel.

> 23 Pa.C.S. § 2313, Joint State Government Committee Comment—1970 (emphases added). Thus, reading § 2313 in pari materia with the official comment, it is not clear and free from all ambiguity that the legislature intended to require the superfluous appointment of counsel under the scenario where, as here, an attorney is serving as guardian ad litem. Tellingly, while the legislature's comment identified a situation where a non-lawyer guardian ad litem could request that counsel be appointed to represent a child's legal interest, there is no reciprocal requirement, either expressed in § 2313 or suggested by the official comment, that precludes an attorney serving as guardian ad litem from also serving as legal counsel.

*Id.* at 787.

Thus, the *K.M.* Court concluded that the orphans' court had not erred when it failed to appoint legal counsel for a child who had already been provided a GAL who was an attorney. The facts of K.M. are analogous to the instant matter. Furthermore, from a practical view, if this Court were to adopt Mother's position, both legal counsel and a GAL would be required for a child in all involuntary termination proceedings. If the legislature had meant for that to be the

23

case it would have so instructed. Additionally, as this Court emphasized in our September 9, 2015 Order of Court given the age of the boys and the GAL's established relationship with them, the Court is satisfied that their best interests are well represented. Consequently, this Court finds Mother's argument on this issue to be without merit.

### III.    Admissibility of Permanency Review Reports and Orders as Exhibits

As resolution of Mother's final two issues are intertwined, the Court will address them simultaneously. Mother asserts that this Court erred when it admitted hearsay evidence contained within Petitioner's Exhibit 1, 3, and 5. These exhibits, which were the same for both boys, were permanency review reports done by their caseworker Nicole Weller.[6] Additionally, Mother argues that this Court erred when it admitted permanency review orders in Exhibits 2, 4, and 6 into evidence because these orders from the juvenile docket were entered under a lower evidentiary standard than that applicable to a termination of parental rights hearing. During the first day of hearing, Petitioner moved for admission of her Exhibits 1 through 16. The following exchange occurred:

> The Court: Any objection to Petitioner's Exhibits 1 through 16 being admitted in each case?
>
> Attorney Nicklas: Your Honor, I have to go through those number by number here. 1 through 6 I would object to on the grounds that the orders were entered following permanency review hearings which have a different evidentiary standard than the termination hearing here today. So there's hearsay all throughout those that was not testified to today.

N.T. 9/15/15 at 163. Petitioner and the Agency both properly responded to Mother's objection and this Court overruled the objection stating:

> The Court: Let's deal with that. Any response?
>
> Attorney Hamilton: Yes, Your Honor. I do believe that as

[6] The three reports were done on October 3, 2014, January 22, 2015, and May 14, 2015.

24

far as there is a hearsay objection, we're also here on a permanency review matter in addition to the modification of placement. I think that as far as things that should not be included in those for consideration of the adoption matter can be separated by the Court.

I'm not asking for them necessarily for the truth of the matter asserted. But those are the reports that were accepted and incorporated as well as the orders that are of record. And I do believe Nicole Weller offered testimony on all of them.

Attorney Yaukey: I would agree with Attorney Hamilton's response also state that it also goes to showing the services provided by the agency and providing timely and regular permanency review hearings for mother to continue advising her of what needed to be done. So I think it also goes to services and efforts provided by the agency for purposes of the termination hearing.

The Court: Petitioner's Exhibits 1 through 16 will be admitted as they are relevant to the determination to be made by the Court today regardless of the burden that was required at the time of their entry as orders and reports.

*Id.* at 163-164.

In support of her argument, Mother directs the Court to the Second Edition of the *Pennsylvania Dependency Benchbook.* ("*Benchbook*") Harrisburg, PA: Office of Children and Families in the Courts, 2014, § 6-5. Specifically, regarding a caseworker's report, the *Benchbook* instructs that "[b]ecause [a caseworker's report] contains background information, as well as the agency's recommendations in the form of a proposed order, this report can be of great use in preparing for the hearing. Of course, the report is not evidence, thus the Judge or Hearing Master cannot base the ultimate decision on any matters in the report that are not established by properly accepted evidence at the hearing itself." *Id.* Consequently, Mother concludes that such reports are not admissible as evidence.

25

This Court finds no reason to depart from the analysis employed at the hearing overruling Mother's objection on these issues. Despite Mother's contentions, the record is clear that the exhibits containing the permanency review reports of the boys' caseworker, Nicole Weller, were "established by properly accepted evidence at the hearing itself." As correctly highlighted by Attorney Hamilton, Ms. Weller offered testimony at the hearing on all three of the permanency review reports in dispute. As to her reports in Exhibits 3 and 5, Ms. Weller testified:

Q Exhibit No. 3, can you tell the Court what that is, please?

A The report to the Court for a permanency review hearing scheduled for January 22nd, 2015.

Q Is that something that you authored?

A Yes, it is.

Q Can you just summarize for the Court what the recommendations were from the agency and what [Mother] needed to do for reunification?

A: At that time, she needed to participate in a psychological evaluation, follow the recommendations, obtain and maintain financial stability, maintain safe stable housing, consistent visitation with [A.D.M.] and [L.B.M.], comply with the terms of criminal sentence and—

The Court: Terms of what?

The Witness: Her criminal sentence and/or probation, refrain from further criminal activity, successfully complete drug and alcohol treatment.

. . .

Q: Exhibit No. 5 in [A.D.M.'s] packet--that's the one I'm referring to in both packets--is another report to court. Did you author that?

A: Yes, I did.

Q: What is the date?

26

A: The report was initially written for a hearing on April 9th, 2015. However, it was continued several times until May 14th, 2015.

. . .

Q Did [Mother] attend the May 14th, 2015, permanency review?

A Yes, she did.

Q: And at that time, what were the things [Mother] had to do in order to be able to, on page 10, in order to be reunified with her children?

A: The same as before. Maintain financial stability, stable housing, consistent visitation, comply with the terms of her criminal sentence and/or probation, and refrain from criminal-further criminal activity and successfully complete drug and alcohol treatment as well as participate in family therapy with [A.D.M.] and [L.B.M.].

N.T. 9/15/15 at 26-27, 30, 32.

Regarding Exhibit 1, Ms. Weller testified:

Q: I'm going to hand you the adoption petition exhibit. Could you identify the report to court at No. 1? Is that something you wrote?

A: Yes, it is.

Q: **And that was presented at the time of the permanency review and first termination; is that correct?**

A: Correct.

. . .

The Court: Just wanted that clear for the record. We have a separate set of exhibits for each child. But they are identified as the same. Exhibit 1 in each case is your report to the Court?

The Witness: Correct.

27

(emphasis added). *Id.* at 25-26. Thus, Petitioner's exhibit one was a report by Ms. Weller that had been completed on October 3, 2014, prior to the first termination proceeding and was properly admitted in that matter.[7]

Thus, Ms. Weller's own testimony regarding her reports was properly accepted evidence that was established at the hearing. Additionally, the reports emphasize the ongoing services provided to Mother by the Agency as well as that timely and regular permanency review hearings were being held in an effort to reunite the boys with Mother. It is well established under Section 2511 (a)(8) and (a)(5), the Court must next look to whether conditions that led to the child's removal continue to exist, despite the Agency's reasonable, good faith efforts. Clearly the type and degree to which the Agency was providing services to Mother is relevant to determine if termination is proper under these subsections.

Finally, this Court also finds Defendant's final issue to be without merit. The permanency review orders and reports from the juvenile docket were relevant to the determination to be made by this Court regardless of the burden that was required at the time of their entry. This Court is obviously cognizant of the evidentiary standard under which these orders and reports were originally entered as evidence and was able to weigh that accordingly. Furthermore, in addition to the TPR hearing, the Court was also being asked to rule on the permanency review matter and a Motion for Modification of Placement filed by Mother. Thus, the permanency review orders

---

[7] At the first termination proceeding, Ms. Weller testified regarding her October 3, 2014, permanency review report stating:

> Q: Directing your attention to Exhibit E through J in the children's permanency review hearing which was held October 3, 2014. G is the permanency review hearing which was held January 2nd, 2014, although the report says 2013. However, that was a typographical error.
> 
> . . .
> 
> Q: Okay. Now, at each of those permanency review hearings, were the same services again recommended for [Mother]?
> A: Yes.

N.T. 10/3/14 at 24-25.

28

and reports were clearly relevant to the decision before the Court and we find Mother's contention on this issue to be without merit.

### B. Goal Change and Motion to Modify Placement

In a goal change proceeding, the Court is required to focus on the child and determine the goal that is in the child's best interest. *See In re A.L.D.*, 797 A.2d 326, 339 (Pa. Super. 2002) (citation omitted). The best interest of the child, and not the interests of the parent, must direct the trial court. *See In re R.I.S.*, 36 A.3d 567, 573 (Pa. 2011). Our appellate courts have explained:

> [T]he decision to allow CYS to change the service plan goal from reunification to adoption is not merely a minor decision permitting a slight shift in the emphasis of CYS' social services. As a practical and legal matter, an order by the juvenile court changing the child's placement goal from reunification to adoption ends any dispute that may exist between CYS and the parent as to the adequacy of CYS' services aimed at reuniting the parent with his/her children and, of course, as to whether CYS had selected the most appropriate goal for this family. By allowing CYS to change its goal to adoption, the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. In other words, the trial court order is the decision that allows CYS to give up on the parent.

*In re A.L.D.*, 797 A.2d at 339 (citation omitted). Indeed, "[a]lthough the Commonwealth is willing to take on the obligation to help parents assume their irreducible minimum parental responsibilities," that obligation "is not indefinite nor has the Commonwealth made itself guarantor of the success of the efforts to help parents assume their parental duties." *Id.* at 340.

Appellate review of a goal change determination is deferential. *See R.I.S.*, 36 A.3d at 573. The reviewing court is required to accept the findings of fact and credibility determinations of the trial court if they find support in the record, but is not required to accept any inferences or conclusions of law. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). The standard of review is an

29

abuse of discretion. *See id.* A trial court abuses its discretion if its judgment is so "manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will." *In re R.P.*, 956 A.2d 449, 455 (Pa. Super. 2008) (internal quotations omitted) (citation omitted). Our appellate courts have stated, "[w]hen the trial court's findings are supported by competent evidence of record, we will affirm 'even if the record could also support an opposite result.'" *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006)). Indeed, the trial court, having "presided over several other hearings with the same parties" and possessing a "longitudinal understanding of the case and the best interest of the individual child involved" is in the best position to "gauge the likelihood of the success of the current permanency plan." *See In re R.J.T.*, 9 A.3d at 1190.

The disposition of dependent children is controlled by the Juvenile Act. *In re R.M.G.*, 997 A.2d 339, 345 (Pa. Super. 2010). At each permanency review hearing, including a goal change proceeding, the trial court must make several determinations mandated by statute, examining whether the current goal remains feasible and continues to be in the best interest of the child. *See* 42 Pa. C.S. § 6351. Section 6351 provides in pertinent part:

> **(f) Matters to be determined at permanency hearing.--** At each permanency hearing, a court shall determine all of the following:
> (1) The continuing necessity for and appropriateness of the placement.
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
> (4) The appropriateness and feasibility of the current placement goal for the child.
> (5) The likely date by which the placement goal for the child might be achieved.
> (5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

30

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months . . . .

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

42 Pa. C.S § 6351(f). Under § 6351, "[s]afety, permanency, and well-being of the child must take precedence over all other considerations," including the parent's rights and wishes. *In re R.M.G.*, 997 A.2d at 347 (quoting *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009)) (emphasis in original). Even if a parent substantially complies with a reunification plan, a goal change to adoption may still be appropriate. *See In re R.M.G.*, 997 A.2d at 347.

I. **Mother's Compliance with Permanency Plan and Court-Ordered Services**

In her first two arguments in the dependency action, Mother argues that this Court erred and abused its discretion when it changed the placement goal of the boys from reunification to adoption. First, Mother avers that she has substantially complied with the permanency plan as she has safe and suitable housing for the children, is employed and financially capable of providing for the children's basic needs, is enrolled in drug and alcohol classes, consistently participates in visitation the boys and participated in a both a psychological and psychiatric evaluation and complies with those recommendations.

Second Mother alleges that she has made substantial progress in alleviating the circumstances which necessitated placement because she has obtained stable housing, financial stability, and is safely able to parent and care for the children. Both arguments by Mother

31

essentially assert that she substantially complied with her court-ordered services necessary to achieve reunification. For various reasons, this Court disagrees.

A majority of the analysis necessary to address Mother's argument on this issue has been extensively discussed and outlined in the termination proceeding above. Consequently, the Court will provide only a brief synopsis in dismissing Mother's issues on this matter. Mother claims that she has "substantially complied with the permanency plan" in question. Such an assertion is absolutely antithetic to the record in the instant matter. The reason the boys have remained in placement for over two years is the direct result of Mother failing to substantially comply with the permanency plan.

The Court is well aware of the strides Mother was making in attempting to be reunified with the boys. However, Mother was unable to see compliance with the permanency plan to its conclusion despite how close she may have been. Furthermore, testimony at the hearing established that despite Mother progress towards reunification up until April of 2015, she was doing so while violating her probation. For the last two years it has been explained and stressed to Mother that a component of her court-ordered services to achieve reunification is that she must abide by provisions of her probation and refrain from further criminal activity. Despite this, by Mother's own admission, she knew she was violating her probation while simply being fortunate in avoiding detection. N.T. 9/18/15 at 7-8.

When the Petition was filed by the GAL, Mother was incarcerated and on disciplinary status. N.T. 9/15/15 at 35-36. Thus, Mother was unable to provide stable housing, was not employed, was unable to financially provide for the boys' needs and could not even have visitation with them. Quite clearly Mother had not substantially complied with the permanency plan. Moreover, even at the time of the hearing, it cannot be said that Mother had "substantially

complied with her permanency plan." Although she was visiting with the boys again after her release from jail, she had been living with her natural father for less than a month. N.T. 9/18/15 at 22. Her father had also agreed to hire her for his self-owned business roughly a week before the hearing. N.T. 9/15/15 at 137-138. These facts would certainly not rise to the conclusion that Mother has substantially complied with obtaining stable housing and financial stability especially in light of the fact the boys' placement was over two years ago. Perhaps best articulated by the GAL at the hearing, Mother's biggest problem is not housing or employment but is her inability to maintain consistency with her court-ordered services. *See* 9/18/15 at 43. For these reasons, this Court cannot conclude that Mother has substantially complied with her permanency plan.

For very similar reasons, the Court must also conclude that Mother has not made substantial progress in alleviating the circumstances which necessitated the boys' placement. As mentioned, Mother had maintained stable housing and employment for less than a month at the time of the hearing and was incarcerated when the Petition was filed. Such facts do not support that Mother has made substantial progress in alleviating circumstances which necessitated the boys' placement over two years ago.

II.     Current Safety Risk

In her next issue, Mother contends that no evidence was presented at the hearing that there was any current safety risk to the boys. Rather, Mother avers that this Court's decision to change the boys' goal from reunification to adoption was based on stability for the boys derived from speculative future circumstances. Mother argues that the relevant inquiry should have been the current situation and analysis of the boys' safety. Mother again quotes the *Benchbook* which states "[judicial determination related to removal, reunification and permanency should be

33

governed by safety." *Benchbook* at § 2-6. This Court finds such an argument fails for multiple reasons.

First, regardless of Mother's contentions otherwise, there was evidence presented at the hearing that raised safety concerns regarding reunifying the boys with Mother. As correctly highlighted by the Agency at the hearing, Mother appears to conclude that simply because she how now obtained "stable" housing with her natural father that all safety issues involving the boys have been remedied. The facts in the instant matter do not support such a conclusion. Throughout the two years the boys have been in placement, Mother has been incarcerated five separate times.[8] N.T. 9/15/15 at 43. Mother's continued inability to stay out of jail raises safety concerns about who would care and protect the boys in the event such behavior continued especially in light of the fact that Father's parental rights have already been terminated. Additionally, many of these incarcerations resulted from probation or parole violations for using opiates or other drugs. N.T. 9/18/15 at 24, 42. Mother also admitted at the hearing that she was struggling with drinking during April of 2015. *Id.* at 33. Despite this, Mother failed to seek alcohol or drug treatment until after she was incarcerated. *Id.* at 33-34. Clearly Mother's continued struggles with addiction to drugs and alcohol are issues that raise safety concerns about her ability to be reunified with and care for the boys.

Mother has also made other poor decisions just months before the Petition in this matter was filed that present safety risks to the boys. Mother was to be reunified with the boys on April 10, 2015. However, testimony by her own stepfather indicates that in April of 2015 Mother was not staying at the O████'s home which was her agreed upon home plan. Instead, she was using the O████'s residence as essentially a storage unit and only returning when the boys would

---

[8] Since the boys' placement on July 3, 2013, Mother has been incarcerated from July 5, 2013 through October 2, 2013; from October 24, 2013 through November 6, 2013; from December 12, 2013 through April 24, 2014; from May 5, 2014 through June 20, 2014 and from April 21, 2015 through August 20, 2015.

34

visit. N.T. 9/15/15 at 219. More troubling was that Mother was staying at a male friend's home who was on parole for various charges including felony robbery. *Id.* at 214, 219, N.T. 9/18/15 at 7-8. These decisions not only ultimately led to Mother being incarcerated for violating her probation but further delayed reunification with the boys and Mother's ability to care and keep them safe. Additionally, such behavior also presented a risk of exposing the boys to a potentially dangerous individual.

This Court would also note that the incident where L.B.M. returned to his foster home with injuries after an unsupervised visit with Mother also presents safety concerns for the boys. Although the incident was later determined to be unfounded, Mother was never able to provide an explanation about how L.B.M. sustained his injuries that were consistent with the medical documentation the Agency received. N.T. 9/15/15 at 89-90. This Court would note that throughout both termination proceedings, there have never been any allegations that Mother herself abused or neglected the children. Although Mother has at times struggled to control and properly redirect the children, an issue any parent of two active young boys is likely to have, by almost all accounts she was been properly able to discipline and show affection to the boys during visits. *Id.* at 120. Thus, the reasons there was evidence at the hearing of current safety risks to the boys was not Mother's inability to parent. Instead, it has been Mother's consistently poor and shortsighted decision making. Simply put, who and what Mother has continued to expose herself to over the last two years has impacted the safety of the boys.

Perhaps most telling regarding current safety risks the boys may face if reunification efforts with Mother continue are best expressed from the GAL who had spoken with A.D.M. on this issue. Specifically, the GAL stated the following at the hearing:

> Also [A.D.M.] is very cognizant of [Mother] being
> biological mother. He's aware that she loves him. And he

> acknowledges that he loves her so much so that all
> disappointment aside, if coming in here today, he'd probably
> tell her he wants to be with her.
>
> However, **[A.D.M.] has also come to realize his mother
> can't keep him safe, he cannot trust her, and he cannot believe
> anything she says.**
>
> [A.D.M.] knows his mom continues to make decisions that
> are contrary to his best interests and understands that it also
> is contrary to [L.B.M.]. He knows that to be stable, safe, and
> ultimately have what's left of his childhood, he needs to be
> something more than what--he needs something more than what
> she can provide right now.

(emphasis added) N.T. 9/18/15 at 46-47.[9] In contrast, neither the GAL, the Agency, A.D.M. nor

Mother have any safety concerns for the boys in their current foster home. *Id.* at 16.

Assuming arguendo, that there was no evidence of a current safety risk to the boys with

reunification with Mother in the home she now shares with her natural father, this would still not

impact this Court's decision to change the goal of the boys to adoption. Mother appears to

misinterpret that "judicial determination related to removal, reunification and permanency should

be governed by safety." *Benchbook*, at § 2-6. Mother asserts that simply because she has now

obtained stable housing, and thus the boys would be safe, that a goal change to adoption is

inappropriate. Mother is correct that safety of a child is an essential factor that must be

considered by a court at a permanency review hearing, including a goal change proceeding. *See*

42 Pa. C.S. § 6351. However, under Section 6351, the statutory authority for matters to be

determined at a permanency review hearing, "safety, permanency, and well-being of the child

must take precedence over all other considerations." *In re D.P.*, 972 A.2d at 1227.

Therefore, simply because a child would be safe in reunifying with a parent is not

dispositive of the decision facing a court at a permanency review hearing. Instead, ensuring that

---

[9] A.D.M.'s own words to the Court on this issue can be found at N.T. 9/15/15 at 10, 11.

the child will be safe wherever they will be placed at the current time, and in the future if reunification occurs, acts as a floor of protection for the child and must guide the court's decision. However, under Section 6351(f) there are a copious number of factors a court must consider. In addition to safety, the court must consider factors such as permanency, the well-being of the child, progress made toward alieving circumstances which necessitated placement, likely date by which the placement goal might be achieved and length of time in placement.

It is undisputed by the parties that there have been no safety concerns regarding the boys care while in their foster home. Furthermore, all of the other factors weigh strongly against Mother and in favor of a goal change to adoption. The boys have been in placement for over two years, yet at the time the Petition was filed Mother was no closer to reunification than she had been on July 3, 2013. For reasons that have been diligently detailed above, Mother has made minimal progress in alleviating the circumstances that necessitated placement. Notably, the two other crucial considerations, permanency and the well-being of both boys, illustrate that a goal change to adoption is necessary. Mother obtaining housing and employment through her natural father less than a month prior to the hearing does not make a goal change from reunification to adoption inappropriate in light of all the other factors necessary for this Court's consideration under Section 6351(f). Such minimal progress over a two year period will not toll the requirements that the Agency has informed Mother she must complete in order to achieve reunification. The boys' need for permanency and their well-being persuade this Court that a change to adoption is absolutely necessary.

III. Motion to Modify Placement

Finally, Mother contends that the Court erred when it denied her Motion to Modify Placement of the boys from foster care to approved kinship care of the O████s. Mother points

37

out that the O█████s have had a relationship with the boys since birth, have consistently visited with them while in placement and have a safe and stable home for the boys to reside. At the hearing both Mrs. O█████and Mr. O█████ testified.

The O█████s reside in Greencastle, Pennsylvania, which is located in Franklin County. N.T. 9/15/15 at 168. The O█████s are currently both employed at Beck Manufacturing. *Id.* at 170, 215. At the hearing, the O█████s indicated they were willing to be a resource for the boys at the present time. *Id* at 171. It is undisputed that prior to the boys coming into placement, the O█████s were contacted about becoming a possible resource. *Id.* at 217. In fact, Mother actually came to the O█████ first and explained to them that if they could not be a resource, she would have to call the Agency. *Id.* Mr. O█████ testified that because of their work schedules and living arrangements they informed Mother they could not be a resource but did not believe she would actually call the Agency. *Id.* As a result, the boys came into placement on July 3, 2013. The O█████s did participate in short visits with the boys beginning in December of 2013. *Id.* at 174. However at no point did they offer themselves as a kinship resource or complete a home study in the first year of the boys' placement. *Id.* 242.

Finally, at the first termination proceeding involving the boys, the O█████s offered themselves as a kinship resource. N.T. 9/15/15 at 43. On October 13, 2014, the Agency made a referral to Family Care Services for a kinship care family profile of the O█████s. *Id.* That referral was subsequently denied in December of 2014 because the O█████s failed to complete all of the paperwork and other requirements. *Id.* This denial occurred roughly a month after this Court's November 25, 2014 *Opinion and Order of Court* that decided against terminating Mother's parental rights. Interestingly, when asked to explain the couple's course of action regarding becoming a resource for the boys since their placement, Mr. O█████testified:

38

Q: You also testified that your primary concern is the boys, the kids come first and they always have. If that's the case, why did you and your wife not make efforts to be considered as a kinship resource for the boys prior to, or complete efforts rather, prior to or after the last termination hearing?

A: Can you repeat that, please?

Q: Sure. You testified that the boys are your main concern, they come first?

A: Yes.

Q: And yet you and your wife did not complete a home study to be considered as a resource until after the last termination hearing?

A: That's correct.

Q: So why did you not complete that if the boys were always your main concern?

A: Because the Judge already ordered the kids could come home at some point in time. Plus we were actually still doing it. And [Mother] got a little mad at us that we did continue doing it. So we stopped.

Q: If the boys were your main concerns, why didn't you say, I get it, I understand but we need to put the boys first?

A: Because it was already determined that they were going to be returned home at some point. So why continue doing it if they were already going to be coming home.

Q: **What about prior to October 2014? They were placed in July of 2013. So over a year prior to that, why did you not take any steps to have them possibly with you?**

A: **I don't have an answer for that.**

(emphasis added) *Id.* at 241-242.

The O███████s did not identify themselves a possible kinship resource again until April 23, 2015, two days after Mother was reincarcerated for violating her probation. *Id.* at 44. The

39

referral was actually approved by Family Care Services but denied by the Agency over issues with the family profile. *Id.* Specifically, the Agency had concerns with Mr. O████'s DUI charges and sobriety. *Id.* Furthermore, the Agency believed the O████s were not supportive of Mother as illustrated by arguments between Mother and Mr. O████ in front of A.D.M. during unsupervised visits. *Id.*

Prior to Mother's April 2015 incarceration she was residing at the O████s' home as it was her approved home plan after her most recent release from jail. At the hearing, the O████s both acknowledged that they were aware that Mother's home plan was their residence and that if she stayed overnight elsewhere she would not be in compliance with her probation. N.T. 9/15/15 at 212, 240. Despite this, Mrs. O████ stated that she was aware Mother had been staying overnight at another man's house roughly two to three nights a week. *Id.* at 205. Mr. O████ further explained that Mother was not even living at their residence but instead using it as a storage unit so she could sleep at her boyfriend's house for two months prior to her probation violation. *Id.* at 219, 227. Additionally, he explained that he suspected her of drinking around this time period. *Id.* However, the O████s each admitted that despite knowing these were violations by Mother of her probation, neither contacted the Agency. *Id.* at 200-201, 227. Finally, the O████s were fully aware that Mother had battled substance abuse issues in the past and was a recovering drug addict. *Id.* 189-190, 231.

Although a change in placement of a child may at times be necessary, a court should implement moving of a child "only when absolutely necessary." *Benchbook*, at § 10-1. Pa. R.J.C.P. 1606(b) provides that a motion for modification must include:

> 1) the specific reasons for the necessity of change to the order;
> (2) the proposed placement;
> (3) the current location of the child;

(4) the manner in which any educational, health care, and disability needs of the child will be addressed;

(5) an averment as to whether each party concurs or objects to the proposal, including the child's wishes if ascertainable; and

(6) the signatures of all the parties.

Unfortunately Rule 1606 provides little guidance on what factors a court should consider when reaching a modification decision. However, the *Benchbook* is instructive on this issue and recommends a trial court to consider:

1. The reasons for the move;
2. If the new placement is more restrictive;
3. The permanency goal and whether the move will enhance the opportunity to realize that goal;
4. The educational and health needs of the child, with special emphasis on if a move with result in a change of schools;
5. Trauma and sense of loss that the child may experience;
6. Continued opportunity for parents/guardians/siblings in the child's life to visit;
7. Safety of the child;
8. Any other factors the court deems appropriate.

*Benchbook*, at § 10-3.

As to the first factor, the reasons for the request appear to be having the boys reside with relatives, their grandparents, as opposed to their current foster family. Second, it does not appear that the proposed placement is more or less restrictive than the boys' current placement. Regarding the third factor, the children's permanency goal and whether the move will enhance the opportunity to realize that goal, this Court finds that a move in placement would have no relevant impact on the boys' goal of adoption.

Turning to the fourth factor, this Court finds that the educational and health needs of the boys require them to remain in their current placement with their foster family. Currently, A.D.M. attends school at Mowrey Elementary in Waynesboro, Pennsylvania. N.T. 9/15/15 at 5,

41

178. The O█████s reside in the Greencastle school district. *Id.* at 178. Ms. O█████testified that A.D.M. likes his current school. *Id.* at 203. A.D.M. did previously attend school in Greencastle although that was prior to March of 2014. *Id.* L.B.M. currently attends a day care program and will soon be starting preschool. *Id.* at 54. L.B.M. appears to be doing very in his day care program and enjoys it. *Id.* at 55. When L.B.M. first came into placement he was struggling with speech problems. However, while with his foster family L.B.M. has made "significant strides in his speech" in large part to speech therapy he attends once a week. *Id.* at 53-54. All of these facts persuade this Court that the educational and health needs of the boys are best served by not instituting a change in placement. Both boys appear to be enjoying and starting to thrive at their schools and this Court has concerns about again upsetting such stability. Furthermore, L.B.M.'s speech has drastically improved while in his current home and routine.

Next, this Court must consider the trauma and sense of loss the boys might experience from a change in placement. Without question, taking L.B.M. out of his foster home and placing him with the O█████ would cause him significant trauma and sense of loss. L.B.M. was incredibly young when he came into placement. N.T. 9/15/15 at 56-57. His foster family is the only family he has ever known. Not surprisingly L.B.M. has referred to his foster parents as mom and dad since he came into placement and continues to do so. *Id.* at 56. In contrast, L.B.M. recognizes the O█████s as grandparents. In fact, both boys refer to Mr. O█████ as Pappy. *Id.* at 216. According to Mr. Kane, A.D.M. also loves his foster family very much and his foster parents treat him like their own son. *Id.* at 156-157. Three months prior to the hearing, A.D.M. began referring to his foster parents as mom and dad. *Id.* at 56. Both boys have also formed significant bonds with their foster siblings. *Id.* at 52, 55. This Court has serious concerns about the trauma and sense of loss both boys would feel if they were torn from their foster home. The

boys love and have a significant bond with their foster family and moving them would only

continue the endless cycle of instability they have endured for so much of their young lives.

Although the sixth factor may allow Mother to visit the boys more often, moving the

children could also restrict their ability to visit with their foster parents and siblings. Therefore,

this Court finds this factor to be of little relevance in reaching a conclusion on this issue. Finally,

there are no safety concerns for the boys in their current foster home.

Additionally, this Court finds numerous other factors relevant in resolving Mother's

Motion. These include the testimony of the O██████s, the length of time the boys were in

placement before the O█████s made themselves a permanent resource and their clear role as

grandparents to the boys as opposed to parents. Specifically on these points this Court stated at

the hearing:

> As to placement pending an adoption, I'm denying the request for a
> modification of placement to the home of Mr. and Mrs. O█████
> for several reasons. I am troubled by the testimony that was
> provided by Mr. and Mrs. O█████ recognizing to different
> degrees the failures of [Mother] while in their home while they
> also had an obligation to be ensuring safety of
> their grandchildren and not providing truthful information about
> [Mother's] living arrangements, about her use of alcohol, about her
> associating with individuals with a criminal record in violation of
> the terms of her parole.
>
> And they are grandparents. It wasn't until this final time of your
> incarceration that they have come forward saying they wanted to
> be a permanent resource.
>
> In the meantime, the boys have developed the relationship, the
> family, the permanency they want with the foster parents who have
> been there 24/7 as the boys have struggled with going in and out of
> preparing to reunify and being rejected and being of an age to
> understand why they're not seeing mom even in jail because she's
> not following rules in jail.

43

So there will be no further changes for these boys. They will have
their answer as to what their life will be and that they will have the
support they need to deal with their new reality.

*Id.* at 53-54.

Taking into consideration all of the aforementioned factors, this Court must conclude that changing the placement of the boys is not absolutely necessary and would actually be incredibly detrimental to them. It would very likely cause significant trauma and sense of loss. Furthermore, a move would be contrary to the boys' educational and health needs. For all these reasons, this Court finds that a modification of placement is inappropriate.

## CONCLUSION

There is no question that Mother deeply loves both of her sons. In many respects, it was this love and bond that persuaded this Court not to terminate the parental rights of Mother a year ago. However, sadly for all involved, the current situation has actually become worse. Despite making strides at certain points during the boys' placement that has lasted well over two years, Mother has failed to the maintain consistency, safety, and stability necessary for reunification. Despite the grounds under Section 2511(a) having been clearly and convincingly proven, the Court takes no pleasure in carrying out its duty in ordering the termination of parental rights and finding the goal of reunification no longer appropriate. Yet even with the support of the Agency, the GAL and Mother's own attorney, Mother's actions convince this Court it has no other choice but to terminate and make a goal change.

Turning to 2511(b), the Court recognizes the bond that exists between Mother and the boys, particularly with A.D.M. Although it may have once been, the bond between Mother and A.D.M. is no longer a nurturing one. It is not a bond that provides the safety and protection a

44

parent must provide a child. Instead, it is a bond that has riddled much of A.D.M.'s young life with disappointment and uncertainty. The record is replete with evidence from various sources that the most important need in A.D.M.'s life at this point is permanency. Both boys are thriving in their foster home and the time has come that each of them will know where they will be in the future. Consequently, this Court finds that despite the emotional bond between Mother and the boys, it is in their best interest that Mother's parental rights are terminated and their permanency goal be changed from reunification to adoption. Furthermore, for similar reasons described in detail above, this Court denies Mother's Modification of Placement. Accordingly, the grounds for termination of parental rights under the statute having been proven and in the boys' best interest, and the goal change being in the boys' best interest, the Court respectfully requests the Superior Court dismiss the instant appeal and affirm the termination of parental rights, goal change to adoption, and denial of Mother's Motion for Modification of Placement.

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| IN RE: ADOPTION OF<br>A.D.M.<br><br>A Minor | :<br>:<br>:<br>: | Orphans' Court Division<br><br>41 - ADOPT - 2014 |
| | : | |
| IN RE: ADOPTION OF<br>L.B.M.<br><br>A Minor | :<br>:<br>:<br>:<br>: | Honorable Carol L. Van Horn<br><br>42 - ADOPT - 2014<br><br>Honorable Carol L. Van Horn |

---

| | | |
|---|---|---|
| IN INTEREST OF: | :<br>: | Juvenile Court Division |
| A.D.M.,<br>A Minor Male Child | :<br>:<br>: | CP-28-DP-0051-2013 |
| Born: March ●, 2007 | :<br>: | Honorable Carol L. Van Horn |
| IN INTERSEST OF: | :<br>: | |
| L.B.M.,<br>A Minor Male Child | :<br>:<br>: | CP-28-DP-0050-2013 |
| Born: May ●, 2011 | :<br>:<br>: | Honorable Carol L. Van Horn |

## ORDER OF COURT

AND NOW THIS __7th__ day of December, 2015, pursuant to Pa. R.A.P. 1931(c),

IT IS HEREBY ORDERED that the Clerk of Courts of Franklin County shall promptly transmit to the Superior Court of Pennsylvania the records in these matters along with the attached Opinion *sur* Pa. R.A.P. 1925(a).

*The Clerk shall immediately docket this Opinion and Order of Court and record in the docket the date it was made. The Clerk shall forthwith furnish a copy of the Opinion and Order*

46

*of Court, by mail or personal delivery, to each party or attorney, and shall record in the docket the time and manner thereof.*

By the Court,

_____
Carol L. Van Horn, P.J.

copies:
Kristen Hamilton, Esq., GAL
Theresa M. Yaukey, Esq., Counsel for Agency
Kristin Nicklas, Esq., Counsel for Natural Mother